Your argument next in number 20-2014 Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co., Mr. Brightbill. Thank you, Your Honor. Good morning and may it please the Court. There's only one issue that petitioners appeal, and that is the lower court's decision to remand and overturn the Commerce Department's treatment of a post-sale price adjustment claimed by Borusan with respect to certain home market sales. We submit that Commerce's determination to limit the post-sale price adjustment claimed by Borusan was in accordance with law and supported by substantial record evidence. Do you agree, Mr. Brightbill, that under Commerce's original decision here that the fact that the adjustment was established is sufficient even if the customer was unaware of the established arrangement? Your Honor, we don't agree that the adjustment was established and known to the customer per Commerce's original decision. No, that's not answering my question. My question is, does it need to be known to the customer if it is established? Because the Commerce decision says known to the customer and or established, and in other places says known to the customer or established. So my question is, do you agree that it is not necessary that it be known to the customer as long as it was established? Your Honor, the Commerce Department has regularly interpreted the provision that it must be known and established. That's not the way the original decision here read. And counsel, nor is it the way the Federal Register, which is what adopted this rule, reads either. At the Federal Register, at 15645, Commerce expressly says, when it lists the factors the department may consider, it says whether the terms and condition of the adjustment were established and or known to the customer at the time of sale and whether this can be demonstrated through documentation. So I guess I share the same question Judge Dyke is asking you, which is, why isn't it clear from all of these articulations that Commerce looks at this to see either whether it's been established in advance through documentation or known to the customer in advance, or possibly both. But why isn't just having the allocation be established in advance through documentation be sufficient? Your Honor, again, for Commerce, the key question has been, and always has been, whether the terms and conditions of a price adjustment were established and known to the customer at the time of sale. And they say that in the modification, that they've consistently applied a process of not granting price adjustments where the terms and conditions were not established and known to the customer. In the Commerce decision that you're saying should have been accepted by the CIT, where in that decision, which begins on 5054, I think, where do they say that it must be both? As I read the decision, it consistently says and, or, or, or. Your Honor, I'm looking at the decision memo right now, and the final modification states that Commerce will generally not. Where are you reading from? This is Appendix 5071. Yep. Right after the quoted five factors, Commerce states that the party claiming the adjustment must demonstrate that the terms and conditions of the adjustment were established and known to the customer at the time of sale. And they cite the final modification, and they also cite the preamble for that. Counsel, that exact same page, 5071, when Commerce is citing what its own law is, which it has indented and quoted from, on the page, say and, or. So, you may be right that at one place in this Commerce decision, they say and, but that's because they're talking about this case. But when they quote the objective law that they are to look to, they actually quote their own statement and slash or. Your Honor, the Commerce Department, again, their practice has been regular, and it's been over 20 years. And that is to determine whether or not the practice is the terms are established and or known to the customer. And they have done it to require both. In any event, we would argue that. Let's assume that we disagree with you on that, and we conclude that it's and, or, or, or, so that it doesn't have to be known to the customer. Do you lose, then, or do you have an argument in addition to that? Well, no, we would argue that the situation here shows that the terms were not actually established either. Why weren't they established? Because the exact dollar amount was known? That's right. I mean, and in this case, the China Steel case is instructive here. There has to be, that the terms of the adjustment are not established or known when it is unknown whether there will be an adjustment or what the amount of the adjustment would be. How could you possibly know in advance what the adjustment's going to be because it depends on a default by the party that's performing? Yes, well, Your Honor, in the limited times where post-sale price adjustments are allowed, it's a very clear situation like a rebate that is set forth with precision. And that's to avoid manipulation of dumping margins after the fact. We don't have anything like that here. In fact, we had terms that changed consistently while this investigation was going on. So when it was a combination of very late timing of the claimed adjustment and shifting contradictory explanations of the adjustment. What you're saying is that you could never have an adjustment that depended on what happened during performance. That if there were, you know, if there's a provision for a breach, a provision for an adjustment, if there's a breach during performance, that could never be a qualifying adjustment because the fact of the breach and the amount of the breach couldn't be known until the performance had been completed. Well, Your Honor, again, something like an established non-discriminatory rebate program that sets out the terms and conditions might be enough for a post-sale price adjustment. You're not responding to my question. Under your theory, it would never be sufficient to result in an adjustment that there was a breach and a provision that required the payment of a rebate based on the breach. Well, Your Honor, it's up to the Commerce Department to determine. It's up to the Secretary's satisfaction to determine. And that's what they did here. And they did grant an adjustment. They just didn't grant it in the amount that Borison sought. They granted it in the amount... Counsel, I think that's one of your problems. One of your problems is the Secretary found that a price adjustment was in fact warranted. And your argument, the argument you're making to Judge Dyke, would support a contrary conclusion. Would it not? Isn't that what your argument would be? If your argument is if the amount is not certain in advance, you can't get a final price adjustment. But here, Commerce concluded otherwise. Well, Your Honor, I'm not saying certain in advance, but I'm saying an established program where the respondent doesn't have the freedom to decide the ultimate amount of the adjustment. That's what is so dangerous about this situation. What Borison did in this case is exactly what Commerce's regulations were designed to prevent, which is a manipulation of the adjustment while the dumping investigation is going on, particularly here where it eliminates the dumping margin altogether. So that's the key point here. Again, the demonstration has to be to the Secretary's satisfaction. They found, based on all the evidence, that some adjustment was warranted, but just not in the amount that Borison claimed, but the amount that the customer knew based on the documents that it had access to in this particular case. So whether, in fact, whether or not Borison paid the penalty is not the issue. The issue is whether that belated penalty was legitimate or posed potential for manipulation. And so, again, that is the critical point here. It's clear from this investigation that Borison was dumping in the U.S. market. It was selling here for less than it sold for the same products in Turkey. But as it turns out, they were late delivering the products in the home market. Should they really escape dumping liability here permanently, merely because there were late deliveries of their product in the home market? The Commerce Department thought no, that the claimed adjustment was not reasonable. And that was the correct decision, and it was supported by substantial evidence. All right. Do you want to save your rebuttal time? I will. Thank you. Okay. Ms. Mendoza? Thank you, Your Honor. I would just like to point out a few key problems, most of which have been discussed already. But first of all, I think that there's no question, based on the appellant's statement of its case on page 2 of its opening brief, that, in fact, the issue before this court is whether or not both requirements are required. In other words, that the terms have to be determined and established, and that the customer have knowledge. I would just point out that there are a number of places where appellants miscite Commerce's decision to say something with respect to the joint venture agreement and the terms they're in. And, in fact, there is no such discussion. I would also point out, when you're reviewing the final rule... Was not available to the customer. The full joint venture agreement was not available to the customer in advance? There is no evidence on the record that the joint venture agreement was presented to the customer. The only thing the customer had was an abbreviated so-called consortium agreement in 2014 that was attached. Which didn't address this question. No, you're right, Your Honor. It did not. Okay. Just going back for a minute, though, to the final rule. I think one thing that's important to note, whenever petitioners... I'm sorry, I keep saying petitioner, appellant. Whenever appellant cites to the final rule, they make it a point to cite to the beginning two pages of the Federal Register Notice 156615642. And that, actually, the first two pages of the final rule are discussing the policy that existed or was proposed. I'm sorry, the policy that was originally proposed or the final rule that was originally proposed on which they thought common. When they turn to the question of what the final rule is then going to be, however, they specifically say, in the proposed modification, they use the phrase established and or known to the customer. So if you look at page 15644 of the final rule, you can see there that they very specifically state this for... Is the final rule in the appendix? Yes, it is, Your Honor. It's contained at... I don't think it is. Oh, I'm sorry, Your Honor. I understand that it's not part of the appendix, but it is... I have a separate copy. Go ahead. Which page? Oh, okay. So if you look at page 1564... I'm sorry, 15644, and you read from the bottom of that page over into the next page on 15645, what you'll see there, it's right before where they state the five-factor test, and what they say there specifically is that they are establishing a broader rule with respect to the requirements concerning a post-sale adjustment. I mean, they use the word that they... intentionally preceding the five-factor test that it's modified to avoid being overly restrictive and to provide more flexibility to commerce to accept post-sale adjustments. And then the five-factor test with the and or language follows. In other words, if you look at the first two pages of the final rule, it would suggest they're kind of discussing what they had originally considered and the comments that they had received. And then what they do is, based on all those comments, then they proceed to say, okay, what now will be this final rule? And so they not only modify the language of the regulations, but they also set out this five-factor test, the first test being whether the terms were established and or known by the customer. So it's very clear that by constant... And in fact, if you look at the... if you look at what appellants have cited in the actual decision of commerce, what you will find is that five-factor test that you were just reviewing with them cites to those subsequent pages, whereas when appellants state that it's an and, and customer knew, they're citing, again, to the first few pages of that final rule. So I think that the policy... I'm sorry. Can you explain the earlier part of this rulemaking decision? Does it use the... Oh, I'm sorry, Your Honor. It's on pages... The earlier part of the rule is on page 15642. 15642. And where on that page? Okay. They cite to the and language. Let me see exactly where that is. Here it is, Your Honor. I'm sorry. It's in the one, two, three, four, fifth paragraph down. It says since enacting the... I'm sorry? Which column? The first column. Yeah, okay. It says since enacting these regulations, the department has consistently applied, and then they talk about we're not establishing known to the customer, and that's what appellant is citing. Okay. So they're reviewing there what the history of the post-sale adjustment has been with Commerce. But, counsel, this is such more. I understand one of the arguments to be made is these factors. Commerce makes it clear in the Federal Register and in its opinion that Commerce may consider any one... Counsel, I'm not sure if that's you shuffling around your papers, but can you try not to because it's very, very distracting. It's coming across extremely loudly. Okay. So one of the issues is the department says it can consider any one or a combination of these factors. It really has complete discretion to make the determination on a case-by-case basis because, as the regulation itself says, it has to be to the satisfaction of the secretary. So in this case, where the customer believed it should be assessed one-third, one-third, one-third, and when that was based at least in part on, or not where the customer's belief wasn't necessarily based, but where Boreson actually responded to a Commerce investigative inquiry with a statement that suggested that customer invoice, invoicing each one-third was appropriate and what they were going to pay, isn't that substantial evidence that would support Commerce's original determination that it was fair to conclude you were entitled to a price adjustment, but that price adjustment should be limited to a one-third, one-third, one-third analysis? Your Honor, just to clarify the record for a moment, Boreson never stated or reported that it was paying one-third of the penalty to the Commerce Department. What Boreson did, in fact, was to report the original demand for penalty payments from the customer, which, as you'll see from the record... Counsel, that's your interpretation, but this is a question of fact, and I have to review Commerce for substantial evidence, and the answer Boreson gave, which is on page 2230 of the record, is that... Counsel, you're killing me with your papers. I'm sorry. ...is to reflect, it says, consortium members for this amount divided equally between the three companies to reflect the signatory percentages in the March 2014 summary of the consortium. Why wasn't it fair for Commerce to interpret that as Boreson's suggestion that it was going to be paying one-third that each of the three companies would pay one-third of this penalty amount? Why isn't Commerce's determination to that extent supported by substantial evidence in light of this statement? Your Honor, because this statement was merely stating that the invoices for the penalty had been sent to each of the three consortium members, and they were each for a third. That is factually correct. However... Counsel, that's not what this says. It does say the invoices will be for a third. Yes. It says to reflect the signatory percentages in the consortium... That's also correct, Your Honor. It did reflect the signatory percentages, and I don't disagree with either of those, but what we said to Commerce and what our argument was before the court below and here is that those were merely a convenience of the agreement. This agreement, this sales contract, provided for joint and several liability. There was no way that simply sending a third and a third and a third to each of the consortium members would have in any way undermined the joint and several liability of the agreement of the sales contract. I mean, the customer could send each of them a third of the penalty, but the facts are clear that in the event that any of the parties didn't pay, all the other parties would have to. So this is sort of one of those course of dealing type situations where the customer does something for the convenience and just to reflect what's in the agreement in terms of the parties that are listed, but it doesn't undermine the essential nature of the sales contract itself, which provided very explicitly for joint and several liability. So what you're saying is it reflected, it was consistent with the summary, but it wasn't consistent with the actual agreement. Correct, Your Honor. I'd say it was, yes, it was simply a methodology for sending invoices, and I don't think it really had any significance other than that. And it surely was based on those signatory percentages, but it wasn't in any way, shape, or form indicating that the customer now believed that each of those three parties was individually responsible for a third. Okay. Yeah, I think that one of the things that, you know, I wanted to just raise, oops, I'm so sorry, is that because the penalty itself was being discussed among, between, I'm sorry, between the consortium and the customer that it is correct to say that the final terms of the penalty itself, which Commerce granted, were being discussed and determined after this case was filed, even though everything else, everything in terms of the performance and the contract agreement, everything had been fixed prior to that. It is true that after that, the consortium with the customer under the sales contract determined that they were also contingently liable and therefore reduced the amount of the penalty. It is not correct to say as appellants do that the consortium was negotiating the penalty. In fact, there's absolutely no evidence on the record of this at all and Commerce never reached that decision or suggested that they believe that decision. In fact, in the verification report, they very explicitly explained that it was only set once. It was set once the final terms of the penalty were established and that the distribution was done in accordance with the penalty Excel files that the client had provided, that the customer had provided to them for determining the penalty and they simply went through it. This is all in the verification report and determined what portion of that penalty was attributable to each of the parties that were delayed. Thank you, Your Honor. Okay. Thank you, Mr. Brightfield. You've got a couple minutes. Yes, thank you, Your Honor. I'd like to go back to two points. First, on the modification and second, on the customer's understanding. Ms. Mendoza talked about that we're only quoting from the early portions of the modification, but let me just point to page 15643 where Commerce is commenting on the comments to the proposed rule and they say, the department finds that the proposed changes will help protect... Where are you reading from on that page? I'm sorry. It's the bottom of the first column of page 15643 under the response section. The department finds the proposed changes will help protect the integrity of our proceedings and our appropriate response to Kohler, an earlier court case, which hinders the department's ability to address after-the-fact rebates which present the potential for manipulation of dumping margins. The purpose of the modification is potential for manipulation of dumping margins and that is exactly why Commerce wanted to expand its power and its discretion and that's the discretion that the lower court ignored. So, when you then look at the issue and decision memo, Commerce found, this is at appendix 5071, we agree that Borisohn incurred a late penalty fee. We also find that the variable amount of the adjustment and the timing of when the parties finalized the adjustment do not support Borisohn's entitlement to the adjustment as allocated in its database. How did Commerce treat the joint venture agreement? I'm sorry, Your Honor. How did they do what with the joint venture agreement? How did they treat the joint venture agreement? In their assessment of how much of a price adjustment should be given, they, what Commerce did was decide, they never, they didn't ignore the joint venture agreement but they focused on the agreement where the customer was a party and that was the sales agreement. So, it's undisputed that the customer wasn't a signatory to the joint venture agreement or that the documentation provided to the customer didn't reflect the relevant terms of that agreement. So, even if the joint venture agreement contains terms allowing the consortium to reallocate penalties, the terms were not established enough to permit consistent or transparent disclosure about this particular adjustment. And there's no doubt what the customer understood here  in the fact that they billed this amount one-third, one-third, one-third and that's the customer's understanding and Commerce found that was a reasonable basis for allocating the post-sale price adjustment particularly because of all the distortion that occurred in the reporting during the case of this, the course of this case, the shifting explanations that Boris gave about the amount of the price adjustment. When they first claimed the price adjustment, they said they had already agreed to pay their customer that amount. Then later, they conceded that they hadn't actually made any payment and that they had just reached an agreement to determine the final penalty amount. And then, Boris also stated that the penalty had been incurred by a consortium of three members who would be billed equally by the customer. That's in the appendix at 2230 to 32. So, again, Commerce deserves discretion in these cases particularly where a post-sale price adjustment can eliminate a dumping margin entirely. Unfortunately, this dumping duty goes away entirely because of this adjustment that occurred and the amount of the adjustment which shifted while the investigation was going on. That's why we think Commerce appropriately limited the amount of the adjustment to what the customer knew at the time rather than the shifting amount that Boris Han eventually arrived at. And for those reasons, we would urge you to remand back to the Court of International Trade with consistent instruction. Thank you very much. Okay. Thank you. Ms. Saunders, before we conclude, the panel will do its conference at 3 p.m. this afternoon. At 3 p.m.? Okay. Thank you. Okay. Okay. Thank both counsel. The case is submitted. That concludes our session for this morning. The Honorable Court is adjourned until tomorrow morning at 10 a.m.